UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

-against-

                                                      **OPINION & ORDER**

ROBERT CARL OLSEN                         04-cr-646 (SJF) (ALL)

Defendant.
----------------------------------------------------------x
FEUERSTEIN, J.

I.      Introduction

Defendant Robert Carl Olsen ("Defendant") was charged with one (1) count of receipt of child pornography and sixteen (16) counts of possession of child pornography on July 20, 2004.[1] Defendant moves to suppress evidence seized during a raid of his home on April 2, 2004. I conducted a suppression hearing on July 14 and 15, 2005. For the reasons set forth below, Defendant's motion to suppress is denied.

II.     Background[2]

A warrant authorizing a search of Defendant's residence at 50 Riverside Drive, Riverhead, New York, was signed by Magistrate Judge Michael L. Orenstein on April 1, 2004. On the morning of April 2, 2004, agents from the Bureau of Immigration and Customs Enforcement executed a raid on the premises pursuant to Magistrate Judge Orenstein's warrant. Defendant moved to suppress the evidence seized at 50 Riverside Drive and another residence on

---

[1] A grand jury returned a superseding indictment on December 22, 2005 charging additional counts of obstruction of justice and perjury arising out of the July suppression hearing.

[2] This Court previously set forth the facts precipitating the instant motion in its April 19, 2005 Opinion and Order. Familiarity with that opinion is presumed, and only those additional facts relevant to this opinion are described.

-1-

numerous grounds. On April 19, 2005, this Court denied Defendant's motion to suppress on all grounds except Defendant's claims that: (1) the Government conducted an unauthorized nighttime search of 50 Riverside Drive and (2) the Government failed to leave a copy of the search warrant.

A suppression hearing on these two issues was held on July 14 and 15, 2005, at which Defendant and numerous officers who participated in the raid testified. The testifying officers were all credible despite some inconsistencies in the testimony of Immigrations and Customs Enforcement Agent Angela Hammons, who was the supervising officer. Inconsistencies in her testimony, however, appear to be the product of her constant involvement in every stage of the search, without time for reflection as the events unfolded in a relatively brief time period.

III. Legal Framework

    A. Burdens

"It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing." United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). However, a *prima facie* demonstration of lack of authority for a search and seizure shifts the burden to the Government and requires it to justify the search by a preponderance of the evidence. Id.; United States v. Levasseur, 618 F. Supp. 1390, 1392 (E.D.N.Y. 1985).

    B. Fed. R. Crim. P. 41(e)(2)(B)

Fed. R. Crim. P. 41(e)(2)(B) requires that a warrant be executed "during the daytime, unless the judge for good cause expressly authorizes execution at another time." Pursuant to Fed. R. Crim. P. 41(a)(2)(B), daytime is defined as "the hours between 6:00 a.m. and 10:00 p.m. according to local time." Non-compliance with Rule 41 does not automatically mandate the

exclusion of evidence, however. Rather, the Second Circuit has held that "courts should be wary in extending the exclusionary rule in search and seizure cases to violations which are not of constitutional magnitude." United States v. Burke, 517 F.2d 377, 386 (2d Cir. 1975). Thus, a violation of Rule 41 will result in the exclusion of evidence only if "(1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." Id. at 386-87.

C. Fed. R. Crim. P. 41(f)(3)(A)

Fed. R. Crim. P. 41(f)(3)(A) requires the officer "executing the warrant [to] . . . give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken." Like Fed. R. Crim. P. 41(e)(2)(B), a violation of Rule 41(f)(3)(A) will only warrant suppression if shown to be prejudicial or the result of an intentional or deliberate disregard for the rule. See United States v. Simons, 206 F.3d 392, 403 (4th Cir. 2000) ("[T]he failure of the team executing the warrant to leave either a copy of the warrant or a receipt for the items taken did not render the search unreasonable under the Fourth Amendment."); see also United States v. Khan, 92 Cr. 274, 1992 U.S. Dist. LEXIS 14148, at *2 (S.D.N.Y., Sept. 18, 1992).

IV. Findings of Fact and Conclusion of Law

At approximately 4:30 a.m. on the morning of April 2, 2004, Immigrations and Custom Enforcement Special Agent William E. Brust left his home on the southwest shore of Nassau County, en route to a 5:30 a.m. meeting at the Suffolk County offices in Riverhead, New York.

(Tr. 46:8-14).³ Agent Brust, who was to participate in an early morning raid of Defendant's home at 50 Riverside Drive, drove for approximately one (1) hour before reaching his destination. (Tr. 46:15, 20-21). At 5:00 a.m., New York State Trooper Christopher Fox arrived at his barracks in Hampton Bays, New York after completing a five hour patrol with his partner, New York State Trooper David Schenck. (Tr. 8:12-25,10:1-2). The troopers' 5:00 a.m. arrival was documented in a "blotter entry" at the Hampton Bay barracks. (Tr. 24:7-8). Troopers Fox and Schenck, who were also scheduled to participate in the raid of Defendant's home, spent the next twenty minutes preparing. (Tr. 9:22-24, 10:3-9). These preparations entailed getting "all our stuff together," (Tr. 10:3), including "get[ting] the stuff out of our one car, split[ting] up into the two cars, [going] into the station, [and] ma[king a] phone call" that lasted approximately 3-5 minutes to Investigator Ted Niksa to determine the location of the pre-raid staging location. (Tr. 10:4-6, 9:14-16). After learning that the meeting place was the Suffolk County offices in Riverhead, Troopers Fox and Schenck got "our directions together, and then left the station" at approximately 5:20 a.m. (Tr. 10:6; 9:22-24). It took the troopers approximately ten (10) minutes to drive the eight (8) miles from the barracks to the county center. (Tr. 10:23-25, 11:1).

At approximately 5:10 a.m., Immigration and Customs Enforcement Special Agent Joseph Lazzara was also traveling to the Suffolk County offices in Riverhead. (Tr. 209:10-11). Immigration and Customs Enforcement Agent Angela Hammons, the case agent coordinating the raid, was at county offices by 5:15 a.m. (Tr. 145:13-14). Troopers Fox and Schenck arrived at the county center approximately fifteen (15) minutes later, at 5:30 a.m., but initially could not find the location where the other officers were gathering. (Tr. 11:5-15). Agent Brust arrived at

---

³References to the suppression hearing transcript of July 14-15, 2005 are in the form "Tr."

the Riverhead site at about the same time, and noticed that "[t]here were a lot of cars there by the time I had arrived at 5:30 . . . ." (Tr. 47:12-13).

Trooper Fox, upon finding the meeting location, was approached by Investigator Niksa and Agent Hammons. (Tr. 12:18-20). Agent Hammons handed Trooper Fox a five-page case folder that provided background on the raid. (Tr. 13:2-15). After reviewing the case folder, Trooper Fox and several other agents discussed "what we were going to do [at] the first location that we were going to go to." (Tr. 13:18-19). Agent Brust also spent some time at the staging location preparing for the raid, and "met in the back offices . . . [with] a bunch of people . . . ." (Tr. 47:7-9).

Awaiting the arrival of computer forensic analyst Agent Joseph Triola, (Tr. 13:20-22, 47:22-24, 48:24-25, 80:4-5, 144:5-11, 207:3-15), Trooper Fox recalled that "somebody . . . asked if anybody wanted coffee or hot chocolate because it was damp that day. It was also misting. And at that point I said that I would take a hot chocolate, and we went back to our vehicles as not to get wet, and we were sitting in our vehicles." (Tr. 13:22-25; 14:1-2; 16:3-8). After approximately 20-30 minutes at the staging location, (Tr. 27:17-18, 48:17), the officers departed and drove approximately 2-3 miles to the site of the raid. (Tr. 15:13-23).

At or shortly after 6:00 a.m., the officers arrived at 50 Riverside Drive. (Tr. 16:1, 48:22, 132:18-19). The warrant was executed shortly thereafter. (Tr. 125:9-12, 127:2-3,131:3-4, 132:18-19, 206:18-20). This is confirmed by, <u>inter alia</u>, Agent Hammons' 6:20 a.m. phone call to a Northeast Region Sector Enforcement Specialist providing notice that the raid was about to commence. (Hammons Decl. ¶ 4). This phone call is documented in Department of Homeland Security National Communications Center phone log. (<u>Id.</u>; Tr. 131:14-15).

wife, Charlotte Olsen,[4] turned on the outside light and opened the door. (Tr. 31:3-6, 36:1-3). During "the initial entry to the residence," (Tr. 34:21), Trooper Fox saw "[o]ne of the members of the team" (Tr. 35:4) hand Mrs. Olsen a "piece of paper" that he "would assume . . . was the search warrant." (Tr. 34:15, 17). While Trooper Fox could not see what was on the piece of paper, he could see that it had typewritten printed matter on it. (Tr: 35:19). Agent Brust did not hand a search warrant to either Defendant or his wife upon entry, (Tr. 62:21-25, 63:1-5), but Defendant heard a female agent inform his wife that she had a search warrant upon entry, (Tr. 150:4-5), and Agent Hammons testified that she "was certain that [she] showed it to Charlotte . . . because we just entered into their home . . . [and] they wanted to know why we are [sic] there." (Tr. 99:13, 18-20).

Following entry, the agents ensured that the Defendant and his wife were properly dressed, (Tr. 29:11-12, 119:9-18), and secured any firearms that were in the residence. (Tr. 29:13-14). Agent Hammons, after making certain Defendant's wife was clothed, spent between ten (10) and twenty (20) minutes interviewing her. (Tr. 119:9-22, 126:4-12). At approximately 6:30 a.m., after concluding her interview with Defendant's wife, Agent Hammons and Agent Lazzara advised Defendant of his <u>Miranda</u> rights, documented by Defendant's signature on the <u>Miranda</u> warning sheet, and began to interview him. (Tr. 119:9-22, 123:17-20, 124:18-23, 125:5-7, 126:4-12, 22-24, 208:13-22, 209:7-9).

Meanwhile, approximately ten (10) minutes after entering the residence, Agent Brust and Deputy Sheriff Bob Greco of the Suffolk County Police began taking pictures of the location.

---

[4]Defendant characterized Charlotte Olsen at the time of the raid as his "fiancée." (Tr. 149:25). She is now married to Defendant. For ease of reference, the Court will refer to her as his wife.

(Tr. 64:17-19, 24-25, 74:10-17, 79:14-18). Although the third picture taken by Brust and Greco shows a clock with a time of 5:55 a.m., (Tr. 73:15-16, 79:6-11), that clock was not set to the correct time. (Tr. 79:9-11).

At 7:30 a.m., Trooper Fox left 50 Riverside Drive, after having remained there for approximately one and one-half (1½) hours. (Tr. 39:9-10, 15, 40:13-15). Shortly after 8:00 a.m., the remaining agents arrived at and conducted a search of the second location. (Tr. 54:7-8). Neither Agent Hammons nor any other agent testified that they left a copy of the warrant at 50 Riverside Drive prior to leaving for the second location. (Tr. 64:13-16, 99:1-4, 101:7-14). The space on the search warrant return entitled "Copy of Warrant and Receipt for Items Left" was left blank. (Tr. 102:4-24).

Defendant's post-hearing memorandum of law cites a number of alleged inconsistencies in the testimony as evidence that the raid was conducted prior to 6:00 a.m. (Def. Post-Hearing Mem. of Law at 8-13). However, the inconsistencies to which Defendant points, largely confined to testimony from Agent Hammons, are insufficient to overcome the consistent and credible testimony of the other agents. Indeed, the timeline proffered by Defendant, which has the raid commencing at 5:10 a.m., (Tr. 151:2-4, 166:18-23), is directly at odds with the consistent and credible testimony of numerous agents that they had not yet even arrived at the staging location at that time. (Tr. 9:22-24, 11:13-15, 14:5-8, 46:4-6, 8-12, 47:12-13, 144:3-11, 145:7-16, 207:8-13). Furthermore, Defendant's claim that the raid could not have occurred at or after 6:00 a.m. because it was dark outside is without merit in light of the credible testimony of numerous agents that it was a foggy, rainy and overcast morning. (Tr. 14:12-15, 30:2-4, 46:25, 47:1). Finally, the 5:55 a.m. time reflected in the clock in the picture is unreliable and insufficient to overcome these agents' credible and consistent testimony, particularly in light of

-7-

Trooper Fox's credible testimony that another clock in Defendant's home also displayed the incorrect time. (Tr. 42:16-21, 43:2-4) ("I remember saying to myself, it can't be that time. And I looked at my watch and it was later than the time on the clock.")

I therefore find that the warrant was executed at or shortly after 6:00 a.m., thereby satisfying the requirements of Fed. R. Crim. P. 41(e)(2)(B). Furthermore, even if the search had occurred prior to 6:00 a.m., Defendant has failed to demonstrate prejudice as there is no indication that the search would not have occurred or that Defendant would have been less "shock[ed] and disorient[ed]" by a later search. (Def. Reply Mem. in Supp. at 8). In addition, and assuming *arguendo* that the agents entered the premises prior to 6:00 a.m., Defendant has failed to demonstrate that an early entry was the result of an intentional and deliberate disregard for Rule 41(e)(2)(B). See Burke, 517 F.2d at 386-87.

Similarly, the failure to leave a copy of the warrant was clearly not the result of intentional or deliberate disregard for Fed. R. Crim. P. 41(f)(3)(A). Therefore, while the agents' failure to leave a copy violated Fed. R. Crim. P. 41(f)(3)(A), it does not rise to the level of a constitutional violation and therefore does not warrant the suppression of evidence. United States v. Pangburn, 983 F.2d 449, 455 (2d Cir. 1993).

V.  Conclusion

Because the search occurred after 6:00 a.m., Defendant has not met his burden of demonstrating that the search was invalid. Even assuming the search may have been executed before 6:00 a.m., Defendant has failed to demonstrate either prejudice or an intentional or deliberate disregard for the rule. Likewise, Defendant has not shown that the failure to leave a copy of the warrant was either prejudicial or the result of an intentional or deliberate disregard for the rule. The motion to suppress is therefore denied in its entirety.

IT IS SO ORDERED.

_____
Sandra J. Feuerstein
United States District Judge

Dated: January 25, 2006
Central Islip, New York

To:

Robert C. Gottlieb
353 Veterans Memorial Highway
Commack, NY 11725

Allen Lee Bode
United States Attorney's Office
610 Federal Plaza
Central Islip, NY 11722